UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


PRESTON CHARLES, et al.,        *    Case No.  16-CV-6868(KAM)
                                *
                                *
              Plaintiff,        *    Brooklyn, New York
                                *    August 21, 20178
     v.                         *
                                *
OPINION ACCESS CORP., et al.,   *
                                *
              Defendants.       *
                                *
* * * * * * * * * * * * * * *   *

        TRANSCRIPT OF CIVIL CAUSE FOR FAIRNESS HEARING
           BEFORE THE HONORABLE JAMES ORENSTEIN
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:        JEANNE-MARIE BATES CHRISTENSEN, ESQ.
                           TANVIR HAQUE RAHMAN, ESQ.
                           Wigdor, LLP
                           85 Fifth Avenue
                           New York, NY  10003

For the Defendants:        EVE IRENE KLEIN, ESQ.
                           Duane Morris LLP
                           1540 Broadway
                           New York, NY  10036

For the Movant, Pro Se:    CHRISLYN WILLIAMS
                           244 Fifth Avenue #200
                           New York, NY  10001



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

```
1              (Proceedings commenced at 10:46)
2              THE CLERK:  Civil cause for fairness hearing,
3     Charles, et al. vs. Opinion Access Corp., et al., docket no.
4     16-CV-6868.
5              Will the parties please state their appearances for
6     the record, starting with the plaintiffs.
7              MR. RAHMAN:  Good morning, Your Honor  For the
8     plaintiffs, Tanvir Rahman and Jeanne Christensen, Wigdor, LLP,
9     for plaintiffs and the class members.
10             MS. CHRISTENSEN:  Good morning.
11             MS. KLEIN:  Good morning, Your Honor.  Eve Klein,
12    from Duane Morris, for the defendant.
13             THE COURT:  Good morning.
14             MS. WILLIAMS:  Good morning, Your Honor.  I'm
15    Chrislyn Williams and I'm pro se.
16             THE COURT:  Okay.  Actually, do you guys represent
17    Ms. Williams as a member of the class?
18             MR. RAHMAN:  Technically --
19             MS. CHRISTENSEN:  Yes.
20             THE COURT:  Okay.  So they are here to represent you
21    but you can certainly speak for yourself.
22             MS. WILLIAMS:  Okay.
23             THE COURT:  I'll make sure that you understand that
24    as things currently stand they represent you.
25             And I understand we have in the gallery a couple of
```

3

1    other members of the proposed class; Mr. Mills and Mr. Thomas.

2    Is that you, folks?

3                MR. MILLS:  Thomas Mills.

4                THE COURT:  Okay.  Folks, you're free to participate

5    if you want.  If you want to be heard, just you let me know.

6    Okay.

7                MR. MILLS:  Thank you.

8                THE COURT:  Okay.  So we're here to have a fairness

9    hearing on the proposed settlement.  I've read the papers and,

10   Ms. Williams, you wanted to be heard about the settlement

11   proposal, so I'm all ears.

12               MS. WILLIAMS:  Okay.  I was notified about the

13   settlement.  I no longer work there. It's been well over five

14   years since I was employed there.

15               THE COURT:  Yeah.

16               MS. WILLIAMS:  And I was notified via mail at my

17   post office box and I sent you the letter explaining all of

18   that.

19               THE COURT:  Yes.

20               MS. WILLIAMS:  The details.

21               THE COURT:  And when I was -- I just don't feel that

22   I was notified adequately.  Like I know that they weren't

23   required by law to, you know, send a registered letter or just

24   send it -- it was sent Third Class Mail.

25               So when I received it, it received it late and then

4

1    when I reached out to them, it took two or three -- it took --

2    you know, they were like oh, it kept ringing and they're like

3    well, someone will notify you.  You have to give them at least

4    48 hours.

5             So then when I was notified I said let them know --

6    I said listen, by the time I received it it was late June and

7    I wanted to reach out to someone to find out what was going

8    on. I don't want to just sign something.  It was past the due

9    date.

10            So they said well, sorry, it's too late.  Really

11   sorry.  And I said well -- and I explained the situation and

12   they're like I'm sorry.

13            And I -- then he said well, do you know what you're

14   entitled to and I said no, what am I entitled to?

15            And then he said I don't know.  So I don't feel like

16   I was given any information about what my rights were.  I know

17   it was -- the place was horrible.

18            I know that I was trained there for 20 hours. I was

19   very articulate, very good on the phones and then once I

20   started working there, people -- they were like oh, depending

21   on how many interviews you require, if you're able to get a

22   lot of interviews and be able to keep people on the phone

23   they'll do this for you and they'll give you this bonus and

24   all.  And that wasn't happening. And so that's one of the

25   reasons why I left there.

5

1          But I just feel like the people that -- then when I

2    reached out again to the party that was handling the lawsuit

3    that was in Minnesota, I asked them, I left them a message

4    asking them what I was entitled to, and again, they still

5    never -- they never even returned my call.

6          So that's why I reached out to the Department of

7    Labor and I reached out to the Attorney General to find out

8    what my rights are, because I feel like the letter should have

9    stated and then even when I sent the letter to you, it still

10   said our records indicate you were employed one day.  That

11   doesn't tell me anything.

12          THE COURT:  I'm sorry.  You sent the letter to me

13   and that's what I said?

14          MS. WILLIAMS:  No.  I sent a letter to you and then

15   the --

16          THE COURT:  Oh, I see.  And they wrote back.

17          MS. WILLIAMS:  They wrote back and they said our

18   records indicate that you were employed one day.  That's all

19   fine, but what day?  Like tell me what day.  You still aren't

20   giving me any -- if you're representing me, I feel like you

21   should be doing due diligence to say okay, well, this is

22   providing you that information and allowing me to decide if I

23   want to opt in or opt out.

24          A lot has happened since --

25          THE COURT:  Well -- and I understand your

6

1     dissatisfaction with receiving the notice.

2              MS. WILLIAMS:  Right.

3              THE COURT:  The timing -- you feel the notice that

4     you got didn't tell you enough about the nature of the case,

5     or what was involved?

6              MS. WILLIAMS:  Correct.  And I --

7              THE COURT:  What would like to know?

8              MS. WILLIAMS:  Well, I would like to -- I wanted to

9     know then like --

10             THE COURT:  No, no.  What do you want to know now?

11             MS. WILLIAMS:  What do I want to know now?  I want

12    to know -- I still haven't found out what the class action --

13    I know the place was horrible. I know that.  That's why I

14    left.

15             THE COURT:  That's not what the case is about

16    though, whether it was horrible.

17             MS. WILLIAMS:  But --

18             THE COURT:  It's a wage claim.

19             MS. WILLIAMS:  Right, but I know what I'm saying --

20    but I know the place wasn't -- I know the wages weren't fair.

21    I know that.

22             THE COURT:  Well, what is it you want to know about

23    the litigation?

24             MS. WILLIAMS:  I wanted to know what I was entitled

25    to and they couldn't even answer that question.

7

1          THE COURT:  Well, they've now told me, and frankly,

2    I'm not sure I quite understand the letter myself.

3          MS. WILLIAMS:  Because I had known that then I was

4    like why would I have done all that. I could have told you

5    that over the phone.  That's a ten second phone call, oh, you

6    were employed there for one day.  But it doesn't make sense

7    because I know I had trained there for at least 20 hours.

8          THE COURT:  Yeah.  The letter I got dated August

9    13th -- and I'm noticing now, and I didn't notice it earlier,

10   Mr. Rahman, your August 13th letter to defendant's counsel but

11   not to Ms. Williams.  You didn't send that to her?

12         MR. RAHMAN:  No, we did not.

13         THE COURT:  All right.  One might think that if

14   you're going to respond to something she said you might have

15   the courtesy to let her know.

16         But in a footnote in their letter to me, Ms.

17   Williams, they said that your share of the settlement would be

18   $3.25.

19         MS. WILLIAMS:  Okay.  And that's fine, but that --

20         THE COURT:  Let me just finish the sentence.

21         MS. WILLIAMS:  Right. Sorry.

22         THE COURT:  But they also say at the bottom of page

23   1 into page 2 that they couldn't provide an estimate of your

24   settlement share because they're not in possession of this

25   information.

8

1      So on one hand they're saying they don't know.  And

2  on the other hand in a footnote they're saying they do know

3  and it's $3.25.

4      Can either of you counsel shed some light on that?

5      MR. RAHMAN:  Sure, Your Honor.

6      It's correct that we do not possess the breakdown

7  (indiscernible) terms of what they're estimated to receive.

8  That's data that the case administrator Dahl possesses.

9      But when we did -- the parties jointly reached out

10  to Dahl after we heard -- after we received Ms. Williams'

11  letter motion and Dahl informed us that she would be entitled

12  to $3.25.

13      THE COURT:  And that wasn't something you can tell

14  her by saying I'll check with the claims administrator and

15  call you back?

16      MR. RAHMAN:  Your Honor, I --

17      THE COURT:  Was that something you could have done?

18      MR. RAHMAN:  I could have done that.

19      THE COURT:  Any reason you didn't?

20      MR. RAHMAN:  I think -- I believe I told her if she

21  contacted --

22      THE COURT:  Is there any reason you did not do it,

23  Mr. Rahman?

24      MR. RAHMAN:  No, there isn't.

25      THE COURT:  All right.  So they've been unreasonably

9

1    rude to you.  I don't know why.  But now you have the

2    information.  And I'm sure going forward counsel won't be rude

3    to other people who will find themselves in a similar

4    situation.

5              It's really needlessly disrespectful and it's one of

6    the reasons people have a dim view of these kinds of actions,

7    unfortunately.

8              MS. WILLIAMS:  Right.

9              THE COURT:  But there it is.  Anyway, so what else

10   would you like to know about the lawsuit?

11             MS. WILLIAMS:  I mean, that's -- I guess that's

12   adequate information, but I wanted to know the dates that -- I

13   mean, I don't know -- I think he said -- he explained that he

14   doesn't have the information so he doesn't know the dates of

15   the employment there.

16             THE COURT:  Yeah.

17             MS. WILLIAMS:  So I just wanted to know how they

18   came up with that number then and how do they -- they said

19   they have record that I was employed there one day.  So what

20   do they --

21             THE COURT:  Well, what's your recollection of when

22   you worked there?

23             MS. WILLIAMS:  Well, I know I trained there for 20

24   hours.

25             THE COURT:  Over how many days?  Do you know?

1          MS. WILLIAMS:  I'm not sure but then I was on the

2     phones and on the floor and I'm not sure how many days I was

3     there because the job I'm at now I've been there for like five

4     years.  So I'm not sure.  It was a while ago.  So that's what

5     I was trying to get an answer.

6          THE COURT:  Do you have any sort of ballpark

7     recollection of how long you were employed there?

8          MS. WILLIAMS:  To be honest, no. I mean, I'm not

9     sure if it was days. I'm not sure. I honestly don't know.

10          THE COURT:  All right.  Counsel, do any of you have

11     information about Ms. Williams' employment?

12          MS. KLEIN:  Your Honor, we were supposed to get a

13     list from the administrator and they have not provided defense

14     counsel with the list despite requests as recently as last

15     evening.  So I don't have that information, but I do know that

16     as trainees we reached a settlement on an average number

17     amount.

18          THE COURT:  You don't know.

19          MS. KLEIN:  And it would be -- I think --

20          MR. RAHMAN:  Your Honor --

21          MS. KLEIN:  -- it was a one day --

22          THE COURT:  We could all make guesses and estimates

23     but I was really just asking if anybody knows.

24          MR. RAHMAN:  Your Honor, I don't --

25          MS. KLEIN:  I'm sorry.  Please -- in the middle.

1          THE COURT:  In the middle so everybody can be heard.

2     Thanks.

3          MR. RAHMAN:  Your Honor, just to make it clear, the

4     defendants -- the company did provide the administrator with

5     the number of days that each class member worked, per year.

6     Broken down by year.  So that was provided by the defendants

7     to Dahl.

8          I don't if the defendants or Dahl knows the precise

9     dates of employment, the days that class members worked but I

10    do know that there was a list that we also received that list

11    the number -- full number of days that --

12         THE COURT:  Guys, I wasn't asking for an argument,

13    or to have you justifying yourselves.  We can get to that.

14    I'm really just finding it -- trying to find out if anyone has

15    the information.  If you don't, you don't.

16         Now if the problem is that you can't get it from

17    that claims administrator, that raises an issue about whether

18    we should have a different administrator, because one would

19    hope you'd have somebody responsive to the parties and members

20    of the class, but we can come back to that.

21         All right.  So nobody knows.  Now is there anything

22    else you're trying to find out?

23         MS. WILLIAMS:  No, I mean, that's what I wanted to

24    know.

25         THE COURT:  I see.

1            MS. WILLIAMS:  I read the letter and the question

2      was about opting in and he precisely said no.

3            THE COURT:  Well, but you -- I don't know if you see

4      it.  You have been allowed to opt in now.

5            MS. WILLIAMS:  Yes.  After -- yes.

6            THE COURT:  Now the question is is that still what

7      you want to do, or do you want to exclude yourself and do you

8      understand what the choice is about?

9            MS. WILLIAMS:  Right. I understand the choices and,

10     you know, I'd like to opt in.

11           THE COURT:  Okay.  So even though they could get --

12           MS. WILLIAMS:  I mean, it's more of like a principle

13     thing, because I do feel that -- I do feel that a lot of -- I

14     mean, and I don't mean to sound a certain kind of way, but

15     there are a lot of people -- the people that are there aren't

16     the type of people that will know.  They rely on -- they rely

17     on other -- on authority to give -- to provide them with

18     information.  They aren't the type of -- some of those people

19     there may not be able to comprehend the letter that they were

20     sent.  So it's not a clear letter in layman's terms.

21            So if they ring either party, either the people that

22     are handling the class action -- the administrators or the

23     counsel, they should be able to provide them with information

24     and not make it so difficult, because a lot of people just go

25     do as they're told.  They just sign and say okay, here.  And

1     that's not fair.

2          THE COURT:  I certainly agree that the lawyers and

3     the claims administrators should be more responsive.

4          MS. WILLIAMS:  Right.

5          THE COURT:  And we can try and work on that.

6          Do you have any objections to the terms of the

7     settlement, because if -- you know, you understand that when

8     there's a settlement for a class everybody who doesn't opt out

9     is bound by those terms.  So you don't get more.  You give up

10    the claims that are released.  You're agreeing to be bound by

11    all the terms of the settlement.

12         So this is your chance to object to it, if you think

13    that there's something unfair about it.

14         MS. WILLIAMS:  I mean, I honestly don't find the

15    fees -- the attorney fees to be fair.

16         THE COURT:  What's your concern about it?

17         MS. WILLIAMS:  Because the fact that I'm sitting

18    here and that I had to reach out and this took a lot of work.

19    Time that I don't have.  I have a number of things that I'm

20    working on, but I believe in my rights. I don't like people

21    violating my rights and I believe that everyone should be

22    heard.  Everyone should -- has a right to knowledge, to

23    information.

24         And if you ring someone and they're dismissive to

25    you, you should find out why.

1          THE COURT:  Yeah.

2          MS. WILLIAMS:  And -- yeah, so -- and I don't think

3    that the fee -- I don't think they're appropriate.  I don't.

4          THE COURT:  Okay.  Now one of the things about the

5    agreement and counsel, please correct me if I've got this

6    wrong, the whole thing has to be approved by the court.

7          But part of the agreement is that if the fee

8    provision -- if the amount of fees awarded is reduced, the

9    amount of the reduction is distributed among the class

10   members.  Is that correct?

11         MR. RAHMAN:  Not the class members, but the

12   authorized claims people who put in claims would be getting --

13         THE COURT:  Right.  So --

14         MR. RAHMAN:  Not all class members.

15         THE COURT:  So it's people who would be getting

16   money under the settlement would be getting a pro rata share

17   more.

18         MR. RAHMAN:  Yes.

19         MS. WILLIAMS:  That's correct.

20         THE COURT:   Ms. Williams, one thing to consider,

21   and tell me whether you object to the settlement, is whether

22   you object to the overall settlement, meaning a class is

23   approved and people have a procedure for making claims and

24   those who make their claims get a share of the amount.

25         If you're objecting to that whole thing because you

1  think the entire settlement is unfair, for any reason, or is

2  it just that the part of it that awards a third in fees to the

3  plaintiff's counsel, that's unfair.  It should be a lower

4  amount to be distributed, but otherwise the settlement is fair

5  in your mind.

6           MS. WILLIAMS:  Well, I read the letter and it said

7  that the overall amount that the defendants have put into the

8  -- was 1.5 million.

9           THE COURT:  Right.

10          MS. WILLIAMS:  So then it's saying that the attorney

11  fees are $500,000.

12          THE COURT:  Right.

13          MS. WILLIAMS:  And I'm not sure how many people are

14  in the class that are entitled to opt in or opt out.  So I'm

15  not sure how much -- how many people are part of that whole

16  pie, but I think that people that have been subjected to

17  unfair wages should definitely benefit more than people who

18  have never set foot in a place that has walked -- walks all

19  over people's rights and is not paying them fairly.

20          THE COURT:  Who are you comparing them to?  The

21  people who have never set foot?  The people who didn't work

22  for them?

23          MS. WILLIAMS:  The attorneys.

24          THE COURT:  Oh, I see what you're saying.  Yes.

25          MS. WILLIAMS:  The attorneys are getting this

16

1    massive fee and meanwhile the employees that were there and

2    subjected to -- it's bad enough the wage is not that high, the

3    unfair wages.  There's people that are living in poverty level

4    and then be told oh, well, this party that's never been -- I

5    mean, you know, granted --

6              THE COURT:  I get your point.  What I'm trying to

7    find out is that a reason in your view to say the whole

8    settlement is thrown out, or the settlement is preserved?  The

9    $1.5 million put into the fund.  That's preserved.  But the

10   amount given to the lawyers is less so that there's more to

11   distribute.  Do you understand the choice?

12             MS. WILLIAMS:  Yeah, I understand the question.

13             THE COURT:  And I'm just not sure I understand what

14   your position is on that.

15             MS. WILLIAMS:  It's not even -- being given this

16   information and -- 3.25, that's fine. I'm not -- that's

17   neither -- that's irrelevant to me at this point.

18             THE COURT:  Uh-hm.

19             MS. WILLIAMS:  But because I've worked there and I

20   know that the people that are there, they're -- I mean, I'm

21   not trying to sound any -- they're there because they have to

22   be there, or they're there because that's maybe the best that

23   they could do.

24             So I think that they should be given as much as

25   possible to make them -- to make the situation fair and right,

1    and I think the only way to do that is to give them as much

2    possible. And giving the attorneys a third of the settlement I

3    don't find that fair.

4              THE COURT:  Okay.  And let me -- because I'm trying

5    to make sure I understand what you'd like to see happen here.

6    So one possible outcome is that -- and I'm not the presiding

7    judge. I'll make a recommendation.

8              MS. WILLIAMS:  Right.

9              THE COURT:  It's a different judge who will make the

10   ultimate decision.

11             But the presiding judge might say overall this is

12   not a fair settlement, throwing the whole thing out.  And then

13   unless some new settlement is reached, at which point people

14   would have a chance to be heard again, the case would have to

15   be litigated.  And you might win, you might lose, but that's -

16   - there would be no particular amount guaranteed to anybody.

17             MS. WILLIAMS:  Right.

18             THE COURT:  It would have to be litigated.  That

19   would be one resolution of what's going on today.

20             Another -- at the other extreme is the court says

21   you know what?  I've heard the objections. I think the whole

22   thing's fair.  I'm going forward with it.

23             MS. WILLIAMS:  Right.

24             THE COURT:  And then you're bound -- having opted

25   in, you're bound to get 3.25 and the lawyers get what they

1    get.

2            MS. WILLIAMS:  Right.

3            THE COURT:  A middle ground is the overall

4    settlement, the end of the case for a total payment of $1.5

5    million is approved, but the court says the lawyer's fee

6    should be reduced to some other amount, and I wouldn't tell

7    you what that is because I don't know, but just some lesser

8    amount and the difference between what they were asking for

9    and what they get that's distributed on the people who are

10    already getting a share of the settlement.

11            MS. WILLIAMS:  Right.

12            THE COURT:  Between, or among those three choices,

13    which is the one you're in favor of?  In other words --

14            MS. WILLIAMS:  Well --

15            THE COURT:  -- nobody gets anything now and the case

16    goes on and it's litigated.

17            MS. WILLIAMS:  Well, probably the one where the

18    employees get their share of the settlement as quickly as

19    possible, because I'm sure that --

20            THE COURT:  Yeah.

21            MS. WILLIAMS:  -- they need it.  And I'm saying that

22    -- I'm not trying to sound condescending or anything, but I

23    just -- I mean, I've worked there and it was a horrible place,

24    which is why -- and I'm not saying like the place, but I'm

25    just saying like any time you mislead someone and you say one

19

1      thing when they accept a job and promise them this and that,

2      or you're going to get this extra for each interview and

3      you're going to get, you know, and then you don't live up to -

4      - you don't fulfill the -- fulfill your promises, then I just

5      feel like it's just false.  And some people just didn't have

6      any -- that's why they're so long.

7              So whatever would allow them -- I mean, I don't

8      agree with the attorney fees but if it will allow the

9      employees to get their -- I'm just stating my opinion.

10             THE COURT:  Okay.  So it sounds like to the extent

11     you have an objection, it's only to the amount of the fees and

12     that one thing that would be acceptable, or more acceptable to

13     you than approving the whole thing is approving the

14     settlement, but reducing the fee award.

15             And that that would be better, in your view, than

16     throwing out the whole thing and having it go forward to

17     litigation.  Have I got it?

18             MS. WILLIAMS:  Correct.

19             THE COURT:  Have I got it?  Is that a fair

20     assessment?

21             MS. WILLIAMS:  I think you got what I mean.

22             THE COURT:  Okay.  Good. I think I understand your

23     objection now and if there's anything more you'd like to add,

24     I'll hear you, but if not, I'll ask for responses from the

25     lawyers. Is there anything else you'd like to say?

1          MS. WILLIAMS:  No.

2          THE COURT:  Okay.  Counsel, anyone want to be heard

3     on the objections?

4          MS. CHRISTENSEN:  Your Honor, Jean Christensen.  I

5     just want to say, Ms. Williams, that I'm a partner at the firm

6     and I apologize on behalf of the firm to what happened to you.

7          And it certainly raised concerns with us ever using

8     this particular company to administer class actions going

9     forward.

10         MS. WILLIAMS:  Right.

11         MS. CHRISTENSEN:  As well as internally raised

12    awareness so that something like that doesn't happen again.

13         MS. WILLIAMS:  Okay.

14         MS. CHRISTENSEN:  Thanks for coming in.

15         THE COURT:  And Ms. Klein, is there anything you

16    wanted to say?

17         MS. KLEIN:  I have no position on the fees, Your

18    Honor.

19         THE COURT:  Okay.  Give me one moment here.

20         All right.  Well, I'm certainly going to take your

21    objection into account and make my recommendation and you are

22    welcome to stay for the rest of the proceeding, if you'd like.

23    Don't feel you have to. I have my own questions for counsel

24    and I don't anticipate making a recommendation today. I'm

25    going to have to write something up. But do feel free to stay,

1      if you like, or leave.  Okay?

2                MS. WILLIAMS:  Okay.

3                THE COURT:  All right.  Counsel, I'm happy to hear

4      from you if you'd like to make a presentation. I've read your

5      papers.  If you prefer, I can ask questions that I have, you

6      know, and you can respond.  However you prefer.

7                But if there's something you'd like to say at the

8      outset, I'm happy to hear you.

9                MR. RAHMAN:  Your Honor, there was two points that

10     we wanted to bring the court's attention and then I think we

11     can allow Your Honor to ask his questions.

12               THE COURT:  Sure.

13               MR. RAHMAN:  In Section 6.1(b) --

14               THE COURT:  Okay.  Give me a moment to get to the

15     settlement agreement.

16               MR. RAHMAN:  It's on page 15.

17               THE COURT:  Yes, give me a moment please.  I'm sorry

18     section 6. --

19               MR. RAHMAN:  6.1(b) -- 6.1(c).  There's a typo.

20               THE COURT:  Yes.

21               MR. RAHMAN:  There's a -- it says 180 days will be

22     void.  It should be 120.  I'm not quite sure why that typo is

23     in there, but it should be that after 120 days the checks that

24     go out to class members become null and void, not 180 days.

25         (Pause.)

22

1          THE COURT:  So if they're not cashed within 120,

2    instead of 180 days.

3          MR. RAHMAN:  Yeah.

4          THE COURT:  All right.  Anything else?

5          MR. RAHMAN:  And one last point.

6          So the parties have also agreed to permit two other

7    class members who filed late opt ins, who gave us reasons why.

8          THE COURT:  Yes.

9          MR. RAHMAN:  And so once we add their shares to the

10   authorized claimant's amount, and also we were told by the

11   administrator that there was also a -- they miscalculated the

12   figures slightly that we gave to the court in our papers.

13         So the total value now that's going to be going to

14   authorized claimants, if Your Honor approves the settlement,

15   would be $458,879.64, which represents 47.71 percent of the

16   potential funds that could be claimed by class members and

17   that would ultimately increase the total amount that

18   defendants would have to pay if Your Honor approves the

19   incentive awards and the class counsel's fee request.  That

20   would increase that number to $997,058.64.  So a slight

21   adjustment to those numbers.

22         THE COURT:  I'm sorry. So the total number going to

23   claimants would be?

24         MR. RAHMAN:  Would be $458,879.

25         THE COURT:  And the total amount of fees that you

23

```
1     request?

2               MR. RAHMAN:  $500,000.

3               THE COURT:  Okay.  Well, I understand your position.

4     I'll ask you to submit a letter with the revised numbers, just

5     a summary of it.

6               MR. RAHMAN:  That's fine.

7               THE COURT:  Okay.  Anything else?

8               MS. KLEIN:  Yes, Your Honor.

9               THE COURT:  Ms. Klein?

10              MS. KLEIN:  Two points.  With regard to the

11    authorized claimant amount, I had $423,879 as of 6:00 p.m. ast

12    evening, so --

13              MR. RAHMAN:  We added the service awards to --

14              MS. KLEIN:  Well, the service awards are in addition

15    to that.

16              THE COURT:  I'll ask you guys after -- we'll set a

17    schedule for a supplemental submission, but I'll just ask you

18    to give me a joint report and let me know if there's any

19    difference of opinion about what the amounts are.

20              MS. KLEIN:  Okay.  And the other item I wanted to

21    raise.  At the last hearing you asked me to address this

22    before you today.  We are seeking a general release for the

23    one opt in and two named plaintiffs because they're getting

24    the service fee, and you asked me if there was any authority

25    to support that.
```

24

1          And I brought a decision exactly on point.  That is

2     *Ranboth,* R-A-N-B-O-T-H - *Venditti,* V-E-N-D-I-T-T-I, vs.

3     *National Retail Sols* and that is the Northern District case

4     that was dated February 6, 2018 and in that case the court

5     specifically approved that.

6          If I may, I'll hand up a copy of the decision.

7          THE COURT:  No, no.  You'll include it -- a citation

8     in the supplemental letter.

9          MS. KLEIN:  Okay.

10          THE COURT:  Okay.  A few questions.  So am I correct

11     that you estimate that the settlement amount is roughly ten

12     percent of what counsel calculated the overall liability to

13     be?

14          MR. RAHMAN:  Your Honor, if we include the total

15     amount that could potentially go to the class in terms of the

16     --

17          THE COURT:  If you get up in front of a judge after

18     winning a verdict, you're successful in the case, how much do

19     --

20          MR. RAHMAN:  If we were win on all our claims and

21     certify the class and --

22          THE COURT:  Well, if you get what you think your

23     clients are entitled to.

24          MR. RAHMAN:  Right.  The number would be around 17

25     million, if we include the --

1          THE COURT:  17 million.  So the total amount is

2     actually less than ten percent.  Okay.

3          And just walk me again through the reasoning for

4     settling at less than ten cents on the dollar?

5          MR. RAHMAN:  Well, Your Honor, in terms of the --

6     we're alleging were the unpaid wages to our clients, we're

7     actually recovering 75 percent of what we estimate to be the

8     best case scenario of unpaid wages, which we lay out in our

9     papers.

10          The additional 15 million we calculated for the

11     inaccurate wage statement penalties, which, as we stated in

12     our motion, that we have not found a case where that claim has

13     been certified --

14          THE COURT:  So why didn't you proceed on that

15     theory?  Look, if you think it's a wrong theory, say so, but

16     then I have to question why you're bringing it in the first

17     place. If you think it's correct, tell me that.

18          MR. RAHMAN:  Well, we do believe we would be able to

19     at the end of the day be able to certify that claim.  But,

20     again, like I said, we have not found a case that has

21     addressed that and defendants have raised some --

22          THE COURT:  Has a case gone the other way?

23          MR. RAHMAN:  We have not found case law that goes

24     either way.  It would be a case of first impression, as far as

25     we're concerned.

1        THE COURT:  Uh-hm.

2        MR. RAHMAN:  As far as we know.  And defendants have

3   raised a viable defense.  They've articulated that they have

4   found case law where we'd be unable to sort of double dip

5   between inaccurate wage statement penalties and unpaid wages.

6   So there is that case law out there.

7        And, again, the issue of being able to certify those

8   kind of claims would be very much up in the air because,

9   frankly, we need to look at each individual class members and

10  look at the amount of wage statements for each of them that

11  were inaccurate and that would require an individualized look.

12       And, again, while we did allege class claims --

13       THE COURT:  That wouldn't preclude class

14  certification though, right?

15       MR. RAHMAN:  Class certification.  Right.

16       THE COURT:  Okay.  It would just be a matter of

17  calculation following a trial on the -- with representative

18  witnesses, right?

19       MR. RAHMAN:  If the class is certified, potentially

20  yes.  Yes.

21       THE COURT:  Okay.

22       MR. RAHMAN:  But getting it certified would, in our

23  view, be a very difficult process from what we know.

24       THE COURT:  Class certification would be difficult.

25       MR. RAHMAN:  Yes.  On that claim.

1     THE COURT:  On that claim.

2     MR. RAHMAN:  On that claim.

3     THE COURT:  On other claims?

4     MR. RAHMAN:  On other claims, we were confident that

5 we would be able to certify those.  And, again, like I said,

6 for the minimum wage for the training claim for the call in

7 pay claim and for the off the clock claim, the total estimated

8 damages -- total estimated back wages owed to the class

9 members, again, best case scenario without any defenses or any

10 offsets, would be $2 million.

11    And we're getting -- we're able to secure a

12 settlement at 75 percent of that number.

13     THE COURT:  So you're essentially treating the other

14 $15 million as worth nothing.

15     MR. RAHMAN:  We're not doing that, Your Honor.

16     THE COURT:  What do you think it's worth?

17     MR. RAHMAN:  How much do we think it's worth?

18     THE COURT:  What do you think your chances of

19 succeeding on that claim?

20     MR. RAHMAN:  Like I just articulated, I think we

21 have a difficult change of getting that claim certified. I'd

22 put us at maybe a ten percent chance of getting that

23 certified.

24     THE COURT:  Okay.  All right.  But overall --

25 certifying a class, is that something you thought was likely

1     to be a close call?

2             MR. RAHMAN:  A close call is accurate.  Yeah, it

3     could be a close call.

4             THE COURT:  Really.  Because my recollection --

5     guys, tell me if I'm -- if I've got this wrong, but there was

6     a stipulation to a collective certification at the outset.

7             MS. KLEIN:  Yes, the notice.   For notice purposes.

8             THE COURT:  Right.  But that's based on -- you

9     didn't think it was worth litigating whether there were

10    similarly situated plaintiffs out there.

11            MS. KLEIN:  For the FLSA issue, yes.  But not for

12    all the state law issues.

13            THE COURT:  Okay.  Fair enough.  But in other words,

14    if the case didn't settle, is there any real doubt that a

15    class would be certified?  A class of plaintiffs?  And guys, I

16    hate to have you pop up and down.  Do feel comfortable.  If

17    you prefer to stand, of course.  But do feel free to sit.

18            MS. KLEIN:  I think that from the defense standpoint

19    they would have had difficulty certifying at least a number of

20    their claims.  It might have been one or so claims that were

21    certifiable, but, for example, there was a wage and time claim

22    which would have been individual specific.  There was a

23    training claim, which there were certain payments made to

24    certain individuals.

25            THE COURT:  Fair enough, Ms. Klein, but that's not

29

1   the question I'm asking.  Is there any doubt in anybody's mind

2   that in the absence of a settlement there would be a class

3   action certified?

4          MS. KLEIN:  Yeah. I would not concede that a class

5   action would have been certified.  We had a lot of defenses to

6   certification.

7          THE COURT:  The class.  All right.  What -- because

8   I mean, look.  The existence of similarly situated plaintiffs

9   was stipulated.  And you didn't have to but I assume you

10  recognize a reality that there are others out there with

11  comparable claims.  A large group.  No reason to suspect that

12  they wouldn't pass bar in terms of typicality and adequacy.

13         So what would be the -- what would be the point at

14  which class certification would be litigated.

15         MS. KLEIN:  The first premise that has been

16  stipulating for notice purposes from out standpoint since it

17  was already state law class claims, (indiscernible)  wasn't

18  doing much additional to do that.  And we didn't want to

19  litigate that point.  We wanted -- we knew there'd be some

20  discovery --

21         THE COURT:  I'm not saying you're bound by it, but I

22  assume it reflected an assessment of what was out there.  But

23  let's assume it has no import at all.

24         What's the issue on which you think they would fail

25  to get class certification in the absence of the settlement?

1          MS. KLEIN:  I think that the claims were

2     individually specific for a lot of people, in terms of the

3     facts.  The waiting time claim was a big piece of their claim.

4     That was in dispute as to what happened.

5          THE COURT:  Okay.

6          MS. KLEIN:  The same with the training claim.  The

7     meal break claim only affected people who worked on certain

8     days.  So I think that wouldn't have been class stipulated.

9          And on the wage statement issue, we had a legal

10     issue. We don't think -- it would have been a triple dip,

11     essentially, because the claim wasn't that the wage statements

12     themselves didn't contain the information, but because there

13     were errors in payment, then there were errors in the wage

14     statements.  And they were already seeking the back wages, the

15     double damages and then a wage statement claim.

16          And there was Second Circuit authority that we think

17     would have questioned the ability to get paid a third time for

18     the same injury.

19          THE COURT:  Okay.  Anything else that anyone wants

20     to tell me about why the less than ten percent recovery is

21     reasonable?  And don't get me wrong. I get it in terms of

22     procedural fairness.  No doubt about that.  But in terms of

23     substantive fairness?

24          MS. KLEIN:  Can I just say one more point?

25          THE COURT:  Yes.

1          MS. KLEIN:  I mean, when we're saying less than ten

2    percent recovery, that was based on, in the defense view, a

3    ridiculous number that was put out there.

4          THE COURT:  I get it.

5          MS. KLEIN:  And, in fact, was trying to use to

6    hammer in the settlement.  The amounts that are paid are

7    really substantial for the claims that --

8          THE COURT:  I know, but I'm using less than ten

9    percent of what the plaintiff's claim they were owed.

10         MS. CHRISTENSEN:  Your Honor, I would just like to

11   mention, on the issue of the statutory wage notice, I think

12   there's a distinction to be made between liability -- a

13   liability determination and then damages analysis.

14         And so while I think the liability argument is

15   strong, if we didn't fall prey to the double dipping issue

16   that, you know, was it an inaccurate wage statement.

17         But that doesn't mean that automatically the

18   statutory  -- those penalties would be awarded -- a court

19   would make them pay for every single wage statement that was

20   potentially inaccurate and I think that's just -- it's a

21   noteworthy distinction because it pushes -- while we still

22   have a liability -- a case for pleading a claim which,

23   frankly, we'd be amiss if we hadn't, because it's our duty to

24   make any potential claims that we have.

25         I'm not sure that such a damages analysis is

1      reasonable.

2              THE COURT:  Well, I don't know if you have a duty to

3      make a claim that you think is really not going to pan out.

4      And one reason not to do it, you have to exercise your

5      judgment.

6              But one of the things that informs the judgment I'm

7      sure is the prospect of a possible settlement and justifying

8      the abandonment of a claim to the court at the fairness stage.

9              And look.  That's a call for you to make at the

10     outset and I have to assess the substantive fairness at this

11     stage and I understand your arguments.

12             Unless there's anything further on that, I'd like to

13     go on to a couple of other issues that I wanted to ask you

14     about.

15             Okay.  Actually, before I go onto issues about the

16     settlement, I neglected -- one housekeeping note.

17             There was an objection from somebody named

18     Estafania.  Elsie Estafania.  And I note that what she says in

19     her letter is, "Therefore, I object to staying in the class in

20     order to further the investigations into the additional class

21     action discrimination and fraud possibly as well."  I believe

22     I'm reading that correctly.  It's handwritten.

23             To my mind that's not so much an objection to the

24     settlement as a decision to opt out.  But does anybody read it

25     differently?  And what I would want to do to avoid making the

1    wrong call about it is have the administrator reach out to Ms.

2    Estafania specifically to say do you wish to not participate

3    in the settlement at all, or do you want to stay in and object

4    to it.  Make sense to everybody?

5            MS. KLEIN:  That's acceptable.

6            MS. CHRISTENSEN:  Yes.

7            THE COURT:  Okay.  Good.

8            And forgive me if I don't go precisely in the order

9    you've addressed these issues in your memorandum.

10           On the service awards, just give me a comparison on

11   the amount that you're proposing to the amounts that each of

12   the proposed award recipients would get under the settlement.

13           MR. RAHMAN:  Sure, Your Honor.  Preston Charles, who

14   is seeking at $15,000 incentive award, he -- based on the

15   number of days that he worked at OAC, he's estimated to

16   receive $439.30.

17           THE COURT:  Uh-hm.

18           MR. RAHMAN:  Mr. Graziano was seeking a $5,000

19   incentive award.

20           THE COURT:  I'm sorry. I though Graziano was getting

21   15 also?

22           MR. RAHMAN:  No, he was the opt in.

23           THE COURT:  Oh, I'm sorry.  Oh, yes.  Yes.  I had my

24   notes wrong.  Forgive me.  Yes.

25           MR. RAHMAN:  Yeah.  Based on his days of work he's

1   estimated to have to be receiving $715.90, and Mr. Pabon, who

2   is seeking $15,000 of an incentive award, based on his days

3   worked he's estimated to be receiving $3,088.15.

4           THE COURT:  So we have multipliers -- you know,

5   comparing the service award to the claims of up to 30.  Do you

6   have any information or could you reasonably provide it to

7   compare that aspect of it?

8           You gave me some cases about percentage service

9   awards, or what percentage of the fund they get.  But I can't

10  really compare that to how it compares it to the award

11  recipient's claims.

12          Is that something you'd be able to determine from

13  the cases you've cited?

14          MR. RAHMAN:  We can go back. I have not seen that

15  kind of analysis.

16          THE COURT:  I'd just like you to sort of cross

17  check, if possible.  I'm not terribly concerned about the

18  named plaintiffs awards, though I do want to give that some

19  thought.

20          But what is Mr. Graziano getting an award for?  What

21  did he do?  Because he -- as an opt in he wasn't involved in

22  the initial intake and helping you write the pleadings.  What

23  did he actually do?

24          MR. RAHMAN:  Well, Your Honor, he can --

25          THE COURT:  And I'm sorry.  Before you answer.  And

1      why him among all of the opt ins?

2              MR. RAHMAN:  Well, he was the only opt ins.  There

3      were no other opt ins. And he did provide us with information

4      about his experiences, put us in contact with other potential

5      class members.

6              THE COURT:  How much time did he spend on this?

7              MR. RAHMAN:  Excuse me?

8              THE COURT:  How much time went into his

9      participation?

10             MR. RAHMAN:  Mr. Graziano's?  I would say several

11     hours. I mean, he -- again, he was a lone opt in.  You know,

12     we talked in detail about the claims, his experiences.

13             He did not attend the mediation, but he was aware of

14     it, and he -- you know, he was consulted with during the

15     process, if there were any questions that we needed to get the

16     answers for our client.

17             So, yes, he was involved.  He didn't -- his name was

18     not on the complaint, but he did opt in soon thereafter.  And

19     he is receiving -- he's also agreed to a general release and

20     his award is a lot less than the other two.

21             THE COURT:  Okay.  The remainder of my concerns

22     relate to the fees and costs.

23             I note that you cite a number of cases approving a

24     third and a percentage approach.

25             They're almost, if not all, pre *Cheeks*.  And I know

1      you take a dim view of judge's providing a gimlet eyed review,

2      as you call it, of billing records. But I think post *Cheeks*,

3      that's exactly what judges are doing.

4            I'd appreciate it if you provide the billing

5      records, rather than just a summary of the hours you claim.

6      The contemporaneous billing records.

7            MR. RAHMAN:  Sure. I believe we did send Your Honor

8      -- we'll check again, but I believe we did directly to Your

9      Honor by mail the time records.  Clearly, you haven't received

10     them.  But we'll go back.  We didn't intend to do that.

11           THE COURT:  File it, if you would.

12           MS. CHRISTENSEN:  Well, Your Honor, if I may.

13           I mean, usually, we don't -- we could go back and we

14     might have to redact things then because I consider our

15     billing records proprietary in the sense that sometimes we

16     write -- you know, we have strategy references and such

17     contained in our billing --

18           THE COURT:  (Indiscernible) them or -- but that's

19     fine.

20           MS. CHRISTENSEN:  Okay.  But that's why we typically

21     don't put them on the ECF.

22           THE COURT:  Okay.  But if you're going to ask me to

23     recommend a fee award, I'd like to see them and I think it's

24     something that should be docketed.

25           And, you know, you make the call in terms of what

1   you redact and what you don't, but I'll make my recommendation

2   based on what I can see.  So --

3          MR. RAHMAN:  Your Honor, if we sent you the

4   unredacted records --

5          THE COURT:  These are judicial documents to which

6   the public has a right of access.  They're going to inform a

7   judicial decision.  So, no, I'm not going to see something

8   that the public also can't see, unless there is a need to do

9   so.

10          So contemporaneous billing records, please, but two

11   basic concerns.  There doesn't have to be a loadstar cross

12   check.

13          The rates that are reflected in the summary that you

14   provided me are higher than typically awarded in this

15   district.  You're shaking your head, ma'am.  Am I incorrect?

16          MS. CHRISTENSEN:  Yeah.  Your Honor, I was just next

17   door within the last 12 months where Judge Carolyn Wade

18   approved my $750 fee and Mr. Rahman of 495.

19          I wasn't involved in this decision to suggest such

20   low rates as part of this motion, but those are our rates.

21   And we have had those rates approved.  So I --

22          THE COURT:  You said next door?  Carolyn --

23          MS. CHRISTENSEN:  In the State --

24          THE COURT:  Oh, in the State Court.

25          MS. CHRISTENSEN:  -- Supreme Court.

1            THE COURT:  Okay.  Yeah.

2            MS. CHRISTENSEN:  And, you know, I mean, I can find

3    other decisions.  I was telling Mr. Rahman that I'm pretty

4    sure I was awarded over $500 an hour in this district. I don't

5    know how many years about, but six or seven.  But I'll find

6    it.

7            THE COURT:  Okay.  And I can find you --

8            MS. CHRISTENSEN:  Yeah.

9            THE COURT:  -- dozens and dozens where the rates

10   typically approved in this district for FLSA cases is 350 to

11   400 an hour for partners and then down accordingly to other

12   attorneys and billers.

13           MS. CHRISTENSEN:  All lawyers don't perform equal

14   work.  And we work really hard to get those rates and we

15   typically get very, very good results for our clients.

16           And I don't think that I should be having my rate --

17   just because that's what some other lawyers get here

18   typically.

19           THE COURT:  It's not just because what some other

20   lawyers get here.  It's what the judges in this district

21   approve.

22           MS. CHRISTENSEN:  If --

23           THE COURT:  And to the extent that you want to have

24   a multiplier in excess of four, it's also far above what is

25   typically approved in this district.  So I'm very concerned

1   about that.

2          And you know, I'm happy to hear from you beyond

3   what's in your papers about the reasons for a multiplier, but

4   this is a case where virtually nothing of any moment happened

5   in court.  You exchanged some discovery. You mediated and you

6   settled early.

7          FLSA cases don't carry a lot of risk and I'm sure

8   you could come up with some examples, but I can't think of one

9   where the plaintiff didn't get some recovery through

10  settlement or a verdict.  Not necessarily what the plaintiff

11  asks for, that's certainly true.

12         But in terms of the risk of getting compensated and

13  a fee switching context, I feel like I must be missing

14  something because I'm not sure I appreciate what the risk is

15  that needs to be compensated through the multiplier.

16         MR. RAHMAN:  Well, Your Honor, in this case

17  specifically the defendants no longer operate in the State of

18  New York.  They closed down their shop in December of last

19  year, 2017.  So they no longer are even active in this state.

20         So there was a substantial risk in being able to

21  collect any kind of judgment from the defendants.

22         And, frankly, in our settlement not only do we have

23  an agreement, we also have multiple guarantees.  We have

24  personal guarantees from the two owners of the company.  They

25  supplied us with a back of evidence of their assets.  So we --

1    which we can enforce, if there's a default.

2            So obviously if we had gone to trial -- obviously,

3    if we didn't win, we would have lost and who knows where we

4    would be.

5            But if we won at trial, there's no certainty that we

6    would ever be able to collect.  We would be able to get a

7    personal guarantte as we have been able to get in this case.

8            And, again, the results speak for themselves.  I

9    know Your Honor has mentioned the ten percent number, but the

10   --

11           THE COURT:  Well, only because of what you told me.

12           MR. RAHMAN:  But the back wages --

13           THE COURT:  I'm not making any of this up.

14           MR. RAHMAN:  Well, Your Honor, we wanted to be

15   candid with the court.  We didn't want to go into -- to not be

16   fully candid, of course.

17           But realistically, you know, the result that we

18   achieved, you know, I think Ms. Klein would agree it -- the

19   defendants were not happy with the result.

20           It took a lot of -- the mediator did a tremendous

21   job and as we told the court it took several months just for

22   him to negotiate the terms of the settlement, because we were

23   -- of the agreement, because it was so contested it was -- and

24   you know, many times there was conversation about, you know,

25   should the parties go forward because, clearly, one side was

1   not happy with the result.

2          But so yes, could we have recovered more potentially

3   at a trial?  Of course.  But (indiscernible)  speaking this

4   was, in our view, a tremendous result for the class of over

5   5,000 individuals.

6          MS. KLEIN:  Your Honor, I would state that's a

7   candid assessment.  There were a lot of issues, a lot of

8   negotiating back and forth and I do have an unhappy client.

9   So that is -- I want to state that.

10         THE COURT:  I rarely see a settlement where anyone

11  walks out happy.  Rarely.  By it's nature settlement

12  disappoints everybody to some extent.

13         On the costs, why is the -- why are the meals and

14  taxi costs, and the mediator fee recoverable litigation costs?

15         The taxis and the meals don't strike me as a

16  litigation cost.  It's part of the overhead that you cover

17  with your fees, I would think.  But if I'm wrong about that,

18  I'm happy to be enlightened.

19         In terms of the mediator fee, particularly where you

20  could have come to a settlement conference with me or another

21  judge for free, again, given that all of this comes out of the

22  pockets of the class that you represent, I want to be sure

23  that despite your dim view of the term, I am being gimlet eyed

24  about it because my role here is to protect the class.

25         MR. RAHMAN:  On that point, I would say that when

1    our clients agreed to cover out-of-pocket expenses separately

2    from the recovery -- secondly, we could provide you with --

3    Your Honor with authority that -- where class counsel has been

4    awarded recovery of expenses such as meals or transportation.

5              And these are costs that we out laid for our clients

6    and we don't believe it's unreasonable to recoup that from the

7    settlement -- from the settlement fund.

8              THE COURT:  All right.  And the mediator's fee?

9              MR. RAHMAN:  Well, Your Honor, it's a cost that we

10   incurred and it was a cost that --

11             THE COURT:  Right, just -- look. There are a lot of

12   costs you could incur and to make it an extreme example, just

13   to illustrate the point.

14             You could have chosen to travel by helicopter

15   instead of taxi and you could have incurred the cost, but

16   would it be reasonable?

17             So why is it reasonable where there is a free option

18   available to take out of the client's recovery?  There may be

19   reasons why it makes sense for you guys. It's more efficient

20   for your practice, and I get that.

21             But to have the clients subsidize it is the

22   question.  Why is that reasonable?

23             MR. RAHMAN:  Well, we certainly could have gone

24   before Your Honor or another magistrate judge.  But we went

25   before a very experienced and noted mediator, Mr. Hunter

1     Hughes --

2          THE COURT:  And I'm sure he's more experienced and

3     informed on these matters than any mere federal magistrate

4     judge could be.

5          But the question is, again, why incur the cost

6     rather than take advantage of the free service?

7          MR. RAHMAN:  Well, Your Honor, I can't predict what

8     would have happened or what results we would have achieved had

9     we gone a different route.

10         All I can say is in our view Mr. Hughes got us a

11    tremendous result. And I can't say for certain whether another

12    judge or another mediation would have gotten us that result,

13    but I will say I attended the mediation along with colleagues

14    and the plaintiffs. You know, we feel that he did an amazing

15    service for us by getting us -- by getting the parties to come

16    to the agreement that he was able to get us to.

17         And so while I don't know what would have happened

18    had we gone to a free magistrate judge, I can say that you

19    know, every penny that was spent on Mr. Hughes, ultimately, in

20    our view, led to a much better result, or more money in the

21    pockets of our class for our clients, than we would have

22    achieved otherwise.

23         THE COURT:  Well, I certainly get the instinct that

24    you get what you pay for.

25         All right.  Those are the things I wanted to address

1    and I'm going to reserve a recommendation pending the

2    supplemental submission I'm going to get.

3           So I'm going to get the revised amounts that are

4    going to the claimants.  I'm going to get, Ms. Klein, the

5    authority that you were describing before.

6           I'm going to reject Ms. Estafania to find out

7    whether she is objecting or opting out.  You're going to

8    provide me your billing records.

9           Oh, the last thing.  And then, of course, if there

10   is anything any of you want to get into, I'm happy to take it

11   up.

12          What's your take on the administrator?  Ms. Williams

13   was understandably concerned about the role of the

14   administrator.

15          And then there's the concern you weren't getting

16   responsive results from it.  Are you planning to stick with

17   this administrator or look for somebody new?

18          MS. CHRISTENSEN:  I mean, in my view it's a highly

19   competitive business and there are multiple other firms that

20   we can select.

21          THE COURT:  Okay.

22          MS. CHRISTENSEN:  And they understand that.

23          THE COURT:  I leave it to all of you to exercise

24   your judgment because I know you all have the incentive to

25   make sure that you're getting good service and don't have

45

1      people complaining to you and then ultimately the court.

2      So just give me an update on what you're proposing with the

3      administrator.

4              I assume that some of these things may require just

5      tweaking the proposed settlement document itself. Is that

6      right?

7              Certainly, if there's a change in administrator --

8              MS. CHRISTENSEN:  Oh, I'm sorry.  You mean we will

9      be eliminating --

10             THE COURT:  No, no.  Or replacing.  If you do, you

11     need to just submit something -- a revised document.

12             MS. CHRISTENSEN:  Oh, right.

13             THE COURT:  All right.  Just attend to the -- you

14     know, crossing the T's and dotting the I's in terms of the

15     settlement paperwork.

16             How long would you like to submit the supplemental

17     matters?

18             MS. KLEIN:  Your Honor,  we don't need any time for

19     our letter, so --

20             THE COURT:  Well, I'd like just on thing that covers

21     everything, rather than get it piecemeal.  And I'm happy to

22     give you the time that you all think you need for it.

23             MR. RAHMAN:  Maybe a week from today.

24             THE COURT:  Okay.  If you think you can do it.

25     Again, I'm not trying to rush you.  So I want you to get

1    everything done to your satisfaction.  So a week?  All right.

2           And once I receive your submissions, I will make my

3    recommendation to Judge Matsumoto.  Anything else for today,

4    folks?

5           MS. KLEIN:  Nothing, Your Honor.

6           THE COURT:  Ms. Williams, or Mr. Mills, or Mr.

7    Thomas, is there anything any of you wanted to add?

8           MR. THOMAS:  I wanted to know -- I'm here observing

9    and I heard that --

10          THE CLERK:  I'm sorry, Judge.

11          THE COURT:  Oh, yes. I'm sorry.  We should -- for

12   the record, you're Mr. Thomas, yes?

13          MR. THOMAS:  Yes.

14          THE COURT:  Go ahead.  Oh, would you actually come

15   up so we can get -- we make an audio recording and from back

16   there we're not going to hear you.

17          MR. THOMAS:   All right.

18          THE COURT:  Go ahead, Mr. Thomas.

19          MR. THOMAS:  Yes.  The administrators said that

20   there was supposed to a lowered judgment.  From my

21   understanding it was 1.5 million-five hundred thousand going

22   to the administrators -- the legal staff --

23          THE COURT:  To the counsel.

24          MR. THOMAS: -- for the class.   The legal staff is

25   for the class action participants, right? 500,000 was supposed

1    to go to them.  35,000 to each original claimant.

2              THE COURT:  Yeah. I think they've lowered that

3    amount.

4              MR. THOMAS:  They said 35,000 each.  That was a

5    total.  A total of 35,000 between the three, which would leave

6    a million and change for the class.

7              MR. RAHMAN:  A little less than that.

8              MR. THOMAS:  A little less. 895,000 or something --

9    970 -- 65,000.

10             There are plenty of people in the class that -- some

11   worked two days. Some worked five days.  Some worked five

12   years. Some worked eight years.

13             Now in that time I worked five years, from 2012 to

14   2016.  All right.  That's five years, if you count it.

15             There was times where I didn't get my bonuses.

16   There was times where I didn't get paid the proper hourly rate

17   that I was supposed to get.  And that was through a five year

18   period.

19             So I wanted to know since the letter stated that

20   payments will be made on or about October.  25 percent in

21   October of this year, and then another 25 percent in March of

22   2019 and the 50 percent of whatever judgment I was supposed to

23   receive is supposed to come in on or before December of 2019.

24             But he just stated that it's not going to be a

25   million.  A little less than a million.  You were saying that

1  it was only going to be 400 and something thousand for the

2  class.

3            MS. CHRISTENSEN:  Can I answer that?

4            THE COURT:  Yes.

5            MS. CHRISTENSEN:  Can I answer that?

6            THE COURT:  Yeah.

7            MS. CHRISTENSEN:  I hear -- I think I understand

8  your question.  Correct me if I'm wrong.

9            What we were representing to the court is the only

10  people -- members of the class who will be receiving money are

11  those who submitted -- who are opting into the class, okay,

12  who have made their claims, meaning that had to take some

13  affirmative step.

14            And so they (indiscernible)  only 1,200 people out

15  of 5,500.  There were potentially, 5,500 class members, but

16  only 1,200 class members submitted --

17            MR. THOMAS:  Submitted the form by June 22nd.

18            MS. CHRISTENSEN:  Correct.  And so we were saying

19  when you total -- for those 1,200 people, what they will be

20  paid it was $458,879.

21            So had more people -- if there were 2,000 instead of

22  1,200 --

23            MR. THOMAS:  It would have been less of a judgment.

24            MS. CHRISTENSEN:  There would have been more money

25  that they had to pay.

1          THE COURT:  In other words --

2          MR. THOMAS:  More money that the plaintiffs had to

3     pay or more money that the class would receive.

4          THE COURT:  Well, here's how I understand it, and

5     counsel, please, tell me if I've got this wrong.  The

6     defendants agreed to pay up to $1.5 million.

7          MR. THOMAS:  Correct.

8          THE COURT:  With a third going to counsel.

9          MR. THOMAS:  Leading counsel.

10         THE COURT:  Yes.  So a million, roughly, would be

11    available for members of the class.

12         The way they've structured it is everybody is

13    assigned a certain number of points and they get their share

14    based on the number of points. So if you work longer you have

15    more of a payment.

16         MR. THOMAS:  More points.  Yeah.

17         THE COURT:  But if half of the class doesn't come

18    forward to make their claim, it's not that that million gets

19    divided up among the half of the class who did come forward.

20    The other half goes back to the defendant's pocket.

21         MR. THOMAS:  It goes back to the defendant.

22         THE COURT:  Yeah. Instead of saying the class is

23    entitled to this amount and we'll divide it up among the

24    people who come forward, they're saying we're -- no matter how

25    few people come forward, we're not going to give you more than

1    your ten percent of what we think you were entitled to, or 75

2    percent of what we think we could have won.  However you want

3    to characterize it.  We're not going to give you more than

4    that, than your share.

5              MS. KLEIN:  Your Honor, if I may --

6              MR. THOMAS:  But that share -- shouldn't that share

7    -- should be -- you're stating that it was 5,000 original

8    class action members, correct?

9              THE COURT:  Something like that.  5,600.

10             MR. THOMAS:  Well, close to it.  Roughly.  Roughly.

11   Only 1,200 opted in.

12             THE COURT:  Yeah.

13             MR. THOMAS:  So the other 3,800 they're not

14   claiming. Their claim is they cease -- they cease --

15             THE COURT:  Nothing and their claims are

16   extinguished, right?  Is that right?

17             MS. CHRISTENSEN:  Yes, correct.

18             MR. THOMAS:  So their claims go back to the

19   plaintiffs?

20             MR. RAHMAN:  The defendant.

21             THE COURT:  The defendant.  In other words, for

22   those 3,000 people or so they get nothing and they can't ever

23   go to court.

24             MR. THOMAS:  Correct.  That part I understand.  But

25   their share is not distributed --

51

1          THE COURT:  Nope.

2          MR. THOMAS:  -- amongst the class that opted in.

3          THE COURT:  Right.

4          MS. KLEIN:  Your Honor, with one correction on that.

5   There's a 30 percent minimum guarantee.  So if it wasn't 30

6   percent, it would be redistributed to get it to 30 percent.

7          THE COURT:  Okay.  Fair enough.

8          MR. THOMAS:  All right.

9          THE COURT:  Now do you understand that, anything

10  that you want to say about it?

11         MR. THOMAS:  I'm just going to ask them roughly how

12  much I'm supposed to get since they said that we would get

13  something in October of this year.

14         THE COURT:  Okay.  I don't know if --

15         MR. THOMAS: I just want to know through their

16  accounting how much I --

17         THE COURT:  And Mr. Thomas, I certainly want you to

18  get that information.  I just don't know if anybody was

19  expecting you to be here and so would have that information at

20  hand.

21         MR. THOMAS:  Understood.

22         THE COURT:  Does anybody have that?

23         MS. KLEIN:  No.

24         THE COURT:  So can I ask you -- same for you, Mr.

25  Mills?

1          MR. MILLS:   No, my question --

2          THE COURT:  Come on up, if you will.

3          MR. MILLS:  -- pertains to that and it's --

4          THE COURT: Hold on.  We just want to make sure --

5          MR. MILLS:  -- will be --

6          THE COURT:  Sir, just wait till you get up near a

7    microphone before you talk.

8          MR. MILLS:  Will that amount be -- will I be able to

9    calculate that amount from the agreement?

10          THE COURT:  From the agreement.  I don't think so.

11          MR. MILLS:  They said they had a formula in the

12    agreement.

13          THE COURT:  Well, the agreement has a formula, but I

14    don't think the notice does. Is that correct?

15          MR. RAHMAN:  That's correct.

16          THE COURT:  Okay.  So, again, what I would encourage

17    you all to do is provide your contact information to the

18    lawyers so that they can have the claims administrator get in

19    touch with you and let you know what your share is.

20          MR. MILLS:  All right.

21          THE COURT:  Okay.  Anybody think there's anything

22    more that we should do with respect to Mr. Mills or Mr.

23    Thomas?  And I know you weren't expecting them to be here

24    today, so you couldn't be prepared to answer their questions

25    about their particular amounts.  But anything else anybody

1    wants to take up today?

2          MR. RAHMAN:  No, we've given them our business cards

3    so please reach out to us.

4          MR. MILLS:  Yeah, everything is  pretty much --

5          THE COURT:  Okay.

6          MR. MILLS:  -- self explanatory.

7          THE COURT:  All right.  Thank you all very much.

8          MR. RAHMAN:  I'm sorry.  One last point, Your Honor.

9          THE COURT:  Yes.

10          MR. RAHMAN:  Ms. Christensen was correct that there

11    has been 1,200 or so class members who have opted in out of

12    the 5,500.

13          I just wanted to note that there were a high number

14    of class members who worked very few days at OAC. There were -

15    - from our numbers, there was about 1,300 -- 35 class members

16    who just worked seven or fewer days.

17          THE COURT:  Yep.

18          MR. RAHMAN:  So there were a large percentage of the

19    class members who had very small claims.  But I've noticed

20    that the average amount that's going to be to the claimants

21    who are interviewers will be close to $400.  And for the

22    trainees about $65.

23          So it would seem that a lot of the class members who

24    did not opt in were likely those who had the smaller claims

25    who worked the fewer days.

1           THE COURT:  Right.  Well, look.  You have a third

2    maybe, not even, of people that opted in.  But the amount that

3    they're getting is close to half of the amount that you had

4    set aside. So I inferred that.

5           But that does remind me.  You're giving me some

6    numbers that I think would be useful to have in making my

7    recommendation.

8           Could you as part of the supplemental submission

9    provide the transcript of today's proceedings so that I have

10   what you told me here today as well to rely on when I make my

11   recommendation?

12          MR. RAHMAN:  That's fine.  Yes.

13          THE COURT:  All right. Thank you, all.  Have a very

14   good day.  Thank you for coming in.

15        (Proceedings concluded at  11:52 a.m. )

16

17

18

19

20

21

22

23

24

25

55

1    I, CHRISTINE FIORE, court-approved transcriber and certified

2    electronic reporter and transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6

7

8    _____        August 13, 2018

9    Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25